# IN THE UNITED STATES DISTRICT COURT
# DISTRICT OF SOUTH CAROLINA
# BEAUFORT DIVISION

| | |
|---|---|
| Mobilization Funding II, LLC,<br><br>      Plaintiff,<br>  v.<br><br>Jessup Construction, LLC, Anthony Setliff, Kimberly Setliff, Barbara Stokes, Scott Stokes, GSH of Alabama, LLC,<br><br>      Defendants, | Case No. 9:24-cv-03592-RMG<br><br>**ORDER AND OPINION** |
| GSH of Alabama, LLC, Barbara Stokes, Scott Stokes,<br><br>      Counter-Plaintiffs,<br>  v.<br><br>Mobilization Funding II, LLC, Jessup Construction, LLC, Anthony Setliff, Kimberly Setliff,<br><br>      Counter-Defendants, | |
| GSH of Alabama, LLC, Barbara Stokes, Scott Stokes,<br><br>      Third-Party Plaintiffs,<br>  v.<br><br>Talem Capital, LLC, Brandon Bey, Scott Peper, and Does 1 Through 20, being those persons or entities whose true identifies are not presently known but who are liable for the acts and/or conduct complained of herein and will be substituted once they have been identified,<br><br>      Third-Party Defendants. | |

1

Before the Court is Third-Party Defendant Brandon Bey's motion to dismiss (Dkt. No. 87). For the reasons stated below, the Court grants the motion.

I.     Background[1]

Third-Party Plaintiffs are Barbara Stokes, Scott Stokes, and GSH of Alabama, LLC (the "Stokes Parties"). GSH is an Alabama limited liability company with its principal place of business in Huntsville, Alabama. (Dkt. No. 78 ¶ 1). The Stokes are BSH's only members and Barbara is the managing member. (*Id.* ¶ 2).

Mobilization Funding II, LLC is a South Carolina limited liability company with its principal place of business in Tampa, Florida. (*Id.* ¶ 3). Third-Party Defendant Scott Peper is MFII's Chief Executive Officer. (*Id.* ¶ 5). He is a Florida resident. (*Id.*).

Westerfeld Construction by Glick, LLC is a Florida contractor. (*Id.* ¶ 6). Third-Party Defendant Brandon Bey is Westerfeld's owner and manager. (*Id.*). He is also a Florida resident. (*Id.*).

By prior order, the Court dismissed the Stokes Parties' claims against Westerfeld for lack of personal jurisdiction. (Dkt. No. 55 at 11).

> At its core, the question before this Court is whether Westerfeld is subject to the jurisdiction of this Court by virtue of its control over the disbursement of funds to its subcontractor, such funds being subject to additional obligations imposed by contracts entered into by its subcontractor with Mobilization, a South Carolina entity. This Court finds that it is not. As the United States Supreme Court has held, the "unilateral activity of another party or a third person is not an appropriate consideration when determining whether a defendant has sufficient contacts with a forum State to justify an assertion of jurisdiction." *Helicopteros Nacionales de Colombia, S. A. v. Hall*, 466 U.S. 408, 417 (1984). That Jessup and Mobilization entered into an agreement by which to structure Jessup's loan repayment obligations does not extend jurisdiction over Westerfeld due to the mere fact that Westerfeld is the contractor from whom the funds owed to Jessup, its subcontractor,

---

[1] Facts are drawn from Counter-Plaintiffs' Seconded Amended Counterclaims, Cross-Claims and Third-Party Complaint ("SAC"). (Dkt. No. 78).

2

> originate and eventually are paid to Mobilization, a South Carolina entity. Nor does the fact that the Funds Control Agreement grants indemnity obligations to Jessup in favor of Westerfeld, which again reflects unilateral activity by Jessup. GSH offers no evidence to support its conclusory allegation that Westerfeld is "responsible for the acts and contracts formed by other conspirators to advance a fraud upon the [GSH] Parties," and falls far short of the prima facie showing necessary to defeat Westerfeld's Rule 12(b)(2) motion.

(*Id.* at 11–12).

Returning to the SAC, on January 25, 2021, Barbara Stokes of GSH was introduced to Peper of MFII for purposes of assisting GSH obtaining funding for GSH's work for FEMA. (Dkt. No. 78 ¶ 21).

By email dated February 6, 2021, Jessup confirmed to GSH that it had included GSH in Jessup's solicitation bid for work in Florida, including the Rebuild Florida Project. (*Id.* ¶ 28).

On February 10, 2021, via email, Peper introduced Barbara Stokes to Bey of Westerfeld. (*Id.* ¶ 36).  This was to connect GSH, Jessup, and Westerfeld for working together on the Rebuild Florida Project. (*Id.* ¶ 37).

"Bey promised that GSH would receive $3 million dollars for its efforts in regard to the Rebuild Florida Subcontract."  (*Id.* ¶ 38). "Peper made [] representations to B. Stokes so that GSH . . . would rely thereupon and enter into construction agreements with Bey and unnamed co-conspirator, WCGB [Westerfeld]" and that Westerfeld would then "refer Jessup and GSH back to MFII for lending." (*Id.* ¶ 39).  Peper further hid from the Stokes Parties that Westerfeld and Bey would receive a "kickback for referring the lending arrangements necessary for the Rebuild Florida Project to MFII." (*Id.*).  Peper also hid that MFII would "control the funds received from the Rebuild Florida Project" and not use the funds to repay the MFII/Jessup Loan Agreement but instead conspire with Bey and others to steal said funds. (*Id.*).

Months later on August 2, 2021, Westerfeld entered into the Rebuild Florida Subcontract with Counter-Defendant Jessup Construction, LLC. (*Id.* ¶ 40). GSH was "not . . . a party to the Rebuild Florida Subcontract." (*Id.*) (but noting GSH's role was "explicitly recognized" therein).

Then, Jessup entered into a loan agreement with MFII, which both Barbara and Scott personally guaranteed, but to which neither Bey nor Westerfeld is a signatory. (*Id.* ¶ 45) ("MFII and Jessup entered the MFII/Jessup Loan Agreement"). "MFII, by and through Peper, and in collaboration and in conspiracy with Bey, and unnamed co-conspirator, WCBG . . . intended to use [the loan, however] to steal the funds from the Rebuild Florida Project." (*Id.* ¶ 46). Further, MFII concealed the fact that it had to borrow money for the above noted loan because it "did not have sufficient funding on its own to fund the MFII/Jessup Loan Agreement since inception." (*Id.* ¶ 59). In sum, "such funds have gone directly to MFII, Peper, Bey, Jessup [and others including Westerfeld] . . . rather than being properly applied to payments towards the MFII/Jessup Loan Agreement, reimbursement of proper expenses related to the Rebuild Florida Subcontract and payment of profits due to GSH." (*Id.* ¶ 68).

MFII sued, inter alia, the Stokes and GSH for defaulting on the loan agreement. Later, the Stokes Parties filed the instant SAC.

By prior order, the Court granted Peper's motion to dismiss the SAC's claims against him. (Dkt. No. 139).

**II.     Legal Standard**

Rule 12(b) (2) of the Federal Rules of Civil Procedure is applicable to motions to dismiss for lack of personal jurisdiction. "When personal jurisdiction is challenged by the defendant, the plaintiff has the burden of showing that jurisdiction exists." *Tetrev v. Pride Int'l, Inc.,* 465 F.Supp.2d 555, 558 (D.S.C. 2006). When a district court decides a pretrial personal jurisdiction

dismissal motion without an evidentiary hearing, the plaintiff must prove a prima facie case of personal jurisdiction. *See Mylan Labs., Inc. v. Akzo, N.V.,* 2 F.3d 56, 60 (4th Cir. 1993). To determine whether a plaintiff has satisfied this burden, the court may consider both defendant's and plaintiff's "pleadings, affidavits, and other supporting documents presented to the court" and must construe them "in the light most favorable to plaintiff, drawing all inferences [,] resolving all factual disputes in his favor," and "assuming [plaintiff's] credibility." *Masselli & Lane, PC v. Miller & Schuh, PA,* No. 99–2440, 2000 WL 691100, at *1 (4th Cir. May 30, 2000); *Mylan Labs.,* 2 F.3d at 62; *Combs v. Bakker,* 886 F.2d 673, 676 (4th Cir. 1989). This court, however, need not "credit conclusory allegations or draw farfetched inferences." *Massellli,* 2000 WL 691100, at *1 (quoting *Ticketmaster–New York, Inc. v. Alioto,* 26 F.3d 201, 203 (1st Cir. 1994)). Plaintiff must also base his claim for personal jurisdiction "on specific facts set forth in the record." *Magic Toyota, Inc. v. Southeast Toyota Distribs., Inc.,* 784 F. Supp. 306, 310 (D.S.C. 1992). Personal jurisdiction over an out-of-state defendant may be either general or specific.

A court may exercise specific jurisdiction when "the out of state defendant engage[s] in some activity purposely aimed toward the forum state and ... the cause of action arise[s] directly from that activity." *ESAB Group, Inc. v. Centricut, LLC,* 34 F.Supp.2d 323, 331–32 (D.S.C.1999); *see* S.C. Code Ann. § 36–2–803. Minimal, isolated or unsolicited contacts, however, do not give rise to the required purposeful connection between an out of state defendant and the forum state. *Umbro USA, Inc. v. Goner,* 825 F. Supp. 738, 741 (D.S.C.1993).

### III.     Discussion

The question is whether this Court has specific jurisdiction over Bey. *See* (Dkt. No. 114 at 12) (arguing only for specific jurisdiction). The Stokes Parties' theory of personal jurisdiction is that Bey personally conspired and collaborated with MFII (a South Carolina limited liability

company). (*Id.* at 12). The Stokes Parties' theory is that, because Bey conspired with MFII to steal money from the Stokes Parties, he purposely availed himself of MFII's being a South Carolina corporation. (*Id.* at 14).

"To succeed on this theory, the plaintiffs would have to make a plausible claim (1) that a conspiracy existed; (2) that [Bey] participated in the conspiracy; and (3) that a coconspirator's activities in furtherance of the conspiracy had sufficient contacts with [South Carolina] to subject that conspirator to jurisdiction in [South Carolina]." *Unspam Techs., Inc. v. Chernuk*, 716 F.3d 322, 329 (4th Cir. 2013).

"To state a civil-conspiracy claim, a plaintiff must allege four elements: '(1) the combination or agreement of two or more persons, (2) to commit an unlawful act or a lawful act by unlawful means, (3) together with the commission of an overt act in furtherance of the agreement, and (4) damages proximately resulting to the plaintiff.' " *Doe 9 v. Varsity Brands, LLC*, 679 F. Supp. 3d 464, 493 (D.S.C. 2023) (quoting *Paradis v. Charleston Cty. Sch. Dist.*, 433 S.C. 562, 861 S.E.2d 774, 780 (2021)). Because "civil conspiracy is an intentional tort, an intent to harm ... [is] an inherent part of th[is] analysis." *Paradis*, 861 S.E.2d at 780 n.9. A plaintiff asserting a civil-conspiracy claim must also allege acts "in furtherance of the conspiracy in a manner separate and independent from [their] other causes of action." *Jinks v. Sea Pines Resort, LLC*, No. 9:21-cv-00138-DCN, 2021 WL 4711408, at *3 (D.S.C. Oct. 8, 2021). Stated another way, if "the particular acts charged as a conspiracy are the same as those relied on as the tortious act or actionable wrong, plaintiff cannot recover damages for such act or wrong, and recover likewise on the conspiracy to do the act or wrong." *Todd v. S.C. Farm Bureau Mut. Ins. Co.*, 276 S.C. 284, 278 S.E.2d 607, 611 (1981), *overruled on other grounds by Paradis*, 861 S.E.2d at 780.

The Stokes Parties contend that Bey induced the Stokes parties into guaranteeing MFII's loan to Jessup so that Bey could receive a "kickback" from MFII, and MFII, Peper, Bey, and Westerfeld could steal all the funds received from the Rebuild Florida Project.

The Court grants Bey's motion. The Stokes Parties' conspiracy allegations as to Bey lack particularity and fail to state a claim. *See Unspam*, 716 F.3d at 329 (noting that, to satisfy the conspiracy theory of jurisdiction, the party must allege "with particularity the conspiracy and overt acts within the forum taken in furtherance of the conspiracy").

First, the intracompany immunity doctrine bars the claims against Bey. The Stokes Parties' allegations generally describe Bey acting as Westerfeld's agent—nothing more. *Buschi v. Kirven*, 775 F.2d 1240, 1251 (4th Cir. 1985) ("A corporation cannot conspire with itself any more than a private individual can, and it is the general rule that the acts of the agent are the acts of the corporation.") (quoting *Nelson Radio & Supply Co. v. Motorola, Inc.*, 200 F.2d 911 (5th Cir. 1952)). For example, the allegation that Bey stated "GSH would receive $ 3 million dollars for its efforts in regard to the Rebuild Florida Subcontract" with Jessup could easily "describe arms-length transactions" conducted "in the ordinary course of business"—and not a wrongful act aimed at luring the Stokes Parties into the above described "conspiracy." *Unspam*, 716 F.3d at 330.

At bottom then, the allegations that Bey had an "independent" personal stake in the Stokes Parties' guaranteeing Jessup's loan from MFII amounts to nothing more than attempting to impute liability upon Bey through the mere fact he was Westerfeld's manager. Such a theory would swallow the general rule. *See ePlus Tech., Inc. v. Aboud*, 3313 F.3d 166, 179 (4th Cir. 2002) (The "personal stake exception" applies "only where a co-conspirator possesses a personal stake independent of his relationship to the corporation.") In sum, the Stokes Parties' allegations against Bey are barred by the intracompany immunity doctrine and fail to state a claim.

Second, and independent of the above, the Stokes Parties also fail to connect Bey's activities (and Westerfeld's)—all outside of South Carolina—to actions in South Carolina giving rise to their claims. No plausible allegations exist showing Bey availed himself of the privilege of conducting activities in South Carolina. Nor have the Stokes Parties alleged plausibly a conspiracy to which Bey was a part. As this Court already held regarding Westerfeld, the Bey manages:

> That Jessup and Mobilization entered into an agreement by which to structure Jessup's loan repayment obligations does not extend jurisdiction over Westerfeld due to the mere fact that Westerfeld is the contractor from whom the funds owed to Jessup, its subcontractor, originate and eventually are paid to Mobilization, a South Carolina entity. Nor does the fact that the Funds Control Agreement grants indemnity obligations to Jessup in favor of Westerfeld, which again reflects unilateral activity by Jessup. GSH offers no evidence to support its conclusory allegation that Westerfeld is "responsible for the acts and contracts formed by other conspirators to advance a fraud upon the [GSH] Parties," and falls far short of the prima facie showing necessary to defeat Westerfeld's Rule 12(b)(2) motion.

(Dkt. No. 55 at 11–12). This logic applies equally here to Bey.

Third and last, it bears noting at least two major inconsistencies that undermine the Stokes Parties' conspiracy theory. First, there is the "kickback" allegation. The Stokes Parties claim MFII incentivized contractor clients to refer "other clients to MFII for similar financing arrangements." (Dkt. No. 78 ¶ 24). The Stokes Parties claim Bey and others hid this arrangement from the Stokes Parties. (*Id.* ¶ 39). But the SAC, to support its kickback allegation, cites to MFII's *own webpage*, which states that "We value our referrals, and we reward it with our diligent service (and a competitive commission for you)." (*Id.* ¶ 24) (citing https://mobilizationfunding.com/partner-with-mobilization-funding/). That MFII publicly advertises its referral program renders almost implausible the Stokes Parties' allegations that Bey and others hid the program as a means of inducing the Stokes Parties into guaranteeing Jessup's loan with MFII.

8

Second and last, the SAC does not even allege that *Bey* referred the Stokes Parties to MFII. Rather, the SAC alleges Barbara Stokes *already knew* Peper and MFII by the time she was introduced to Bey because she had sought financing from MFII for a separate project. (*Id.* ¶¶ 21, 37). Again, such inconsistences cast doubt on the plausibility on the Stokes Parties' conspiracy theory.

*     *     *

For the various reasons stated above, the SAC fails to establish personal jurisdiction over Bey.

### IV.     Conclusion

For the above reasons, the Court **GRANTS** Bey's motion to dismiss. (Dkt. No. 87).

**AND IT IS SO ORDERED.**

  s/ Richard M. Gergel
Richard Mark Gergel
United States District Judge

October 27, 2025
Charleston, South Carolina